Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| HERIBERTA PEÑA<br><br>Recurrido<br><br>v.<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA<br><br>Peticionario | KLAN202500134 | APELACIÓN, **acogido como** *CERTIORARI,* Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2021CV00262 (507)<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Álvarez Esnard y la jueza Prats Palerm.

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 19 de mayo de 2025.

Comparece ante nos la Autoridad de Energía Eléctrica ("AEE" o "Peticionaria") mediante escrito intitulado *Recurso de Apelación* presentado el 18 de febrero de 2025.[1] Nos solicita que revoquemos la *Sentencia Parcial* dictada y notificada el 7 de octubre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario" o "foro *a quo*"). Mediante el aludido dictamen, el foro primario determinó que la causa próxima del accidente que le causó la muerte al señor Yabril Medrano Peña ("señor Medrano") fue una línea de distribución propiedad de la AEE. Por tanto, el foro *a quo* concluyó que la muerte del señor Medrano fue a causa de la negligencia de la Peticionaria.

Por los fundamentos que expondremos a continuación, **expedimos** el auto de *certiorari* y **revocamos** el dictamen recurrido

---

[1] En vista de que foro primario solo adjudicó el elemento de negligencia y dejó pendiente la adjudicación de la cuantía que ha de indemnizarse por daños y perjuicios, el dictamen recurrido constituye una resolución interlocutoria. *Abrams Rivera v. E.L.A.,* 178 DPR 914, 928 (2010). Por tanto, acogemos el recurso de epígrafe como un *certiorari* por ser lo procedente en derecho, aunque por razones de economía procesal conserve la designación alfanumérica.

**I.**

Surge de los autos que, el 22 de enero de 2021, la señora Heriberta Peña ("señora Peña" o "Recurrida") instó *Demanda* sobre daños y perjuicios contra la AEE y otras entidades de nombre desconocido.[2] Mediante esta, la Recurrida alegó que era la madre biológica del señor Medrano. Narró que el 23 de enero de 2020, el señor Medrano realizaba trabajos de remodelación en el techo de un edificio ubicado en el municipio de Bayamón. Explicó que mientras este ejecutaba sus labores, entró en contacto con una línea de distribución de cuatro mil ciento sesenta (4,160) voltios, el cual inadvertidamente, transcurría sobre parte del techo del edificio. La Recurrida puntualizó que la aludida línea era propiedad de la AEE y el contacto que tuvo el señor Medrano con esta le ocasionó la muerte a este último.

De igual forma, la señora Peña argumentó que la AEE era la entidad responsable de la transmisión eléctrica en Puerto Rico y tenía conocimiento de la ubicación de la línea de distribución que descansaba en el techo del local previamente mencionado. Asimismo, arguyó que la AEE también tenía conocimiento de las condiciones de peligrosidad y la falta de mantenimiento que había en dicha línea de distribución. Detalló que, el día de los hechos, la línea de distribución estaba completamente desprovista de protección y no había letreros o avisos de seguridad que advirtiera sobre la peligrosidad del cable. En vista de lo antes expuesto, la señora Peña solicitó la cantidad de un millón quinientos mil dólares ($1,500,000.00) por la pérdida de su único hijo como consecuencia de los actos de la AEE. Además, solicitó quinientos cuarenta mil dólares ($540,000.00) por concepto de lucro cesante dejado de percibir por su hijo tras su fallecimiento, más doscientos

---

[2] Véase, apéndice del Recurso, pág. 1-5.

cincuenta mil dólares ($250,000.00) en concepto de daños emocionales.

En respuesta, el 26 de abril de 2021, la AEE presentó *Contestación a Demanda.*[3] Mediante esta, negó ciertas alegaciones y levantó sus correspondientes defensas afirmativas. En específico, afirmó que en la presente controversia, el edificio en cuestión invadió una servidumbre de paso de líneas eléctricas de la AEE. Del mismo modo, esbozó que el señor Medrano no tuvo suficiente cuidado al caminar por el techo del aludido edificio, de manera tal que pudiera evitar el contacto con la línea eléctrica. Igualmente, esbozó que, aún si se asumiera que el señor Medrano trabajaba para otra persona o entidad, serían estos últimos los responsables por el accidente.

Transcurrido un tiempo, el 23 de diciembre de 2023, la señora Peña presentó *Moción de Sentencia Sumaria Parcial sobre Responsabilidad de la Demanda.*[4] Por virtud de esta, solicitó que se determinara que la AEE fue negligente al no corregir la situación peligrosa que representaba el que la línea no cumpliera con el despeje apropiado y que dicha negligencia fue lo que le causó la muerte al señor Medrano. Examinado este escrito, el 28 de diciembre de 2023, el foro primario concedió veinte (20) días a la AEE para que expusiera su posición.

Así las cosas, el 17 de enero de 2024, la AEE presentó *Moción en Solicitud de Prórroga.*[5] En esta, expuso que el descubrimiento de prueba no había culminado en ese momento, lo cual no le permitía estar en posición para presentar la oposición a la solicitud de sentencia sumaria parcial instada por la señora Peña. Por tanto, solicitó un término de treinta y cinco (35) días para presentar oposición, el cual vencía el 15 de marzo de 2024. Al

---

[3] *Íd.*, págs. 6-22.
[4] *Íd.*, págs. 23-33.
[5] *Íd.*, págs. 280-281.

día siguiente, el 18 de enero de 2024, el foro primario otorgó la prórroga solicitada.[6] Además, el 31 de enero de 2024, el foro *a quo* dictó *Orden* en la cual, entre otros asuntos, dispuso que "el descubrimiento de prueba culmina con las deposiciones de los testigos antes mencionados y la contestación a la solicitud de sentencia sumaria vence el 15 de marzo de 2024".[7] Agregó que "[n]o se admitirán más solicitudes de prórrogas de descubrimiento de prueba y en la contestación a la solicitud de sentencia sumaria". [8]

Entre tanto, el 7 de febrero de 2024, la AEE presentó *Moción en Solicitud de Transferencia de Vista*.[9] Mediante la misma, informó que la Conferencia con Antelación de Juicio estaba señalada para el 19 de marzo 2024, la presentación del *Informe Preliminar entre Abogados y Abogadas* vencía el 11 de marzo de 2024 y la oposición a la solicitud de sentencia sumaria vencía el 15 de marzo de ese año. Notificó que la representación legal de la AEE había sufrido un percance de salud, por lo que solicitó extensión del término para presentar tanto el informe de abogados como el escrito de oposición para una fecha posterior. Atendido este escrito, el foro primario determinó lo que sigue:

> Se deja sin efecto el señalamiento del 19 de marzo de 2024 y se reseñala para el 1 de abril de 2024 a las 10:30am por videoconferencia.
>
> Se concede la prórroga [sic] solicitada, tienen hasta el 20 de marzo de 2024 para presentar la oposicion [sic] a la sentencia sumaria y el informe preliminar entre abogados.[10]

Así pues, el 20 de marzo de 2024, la AEE presentó *Moción de Prórroga*.[11] Mediante la misma, entre otros asuntos, esbozó que no contaba con la transcripción de la deposición de uno de los testigos. Igualmente, indicó que existían algunos asuntos de

---

[6] *Íd.*, pág. 282.
[7] *Íd.*, págs. 283-284.
[8] *Íd.*, pág. 283.
[9] Véase, SUMAC, Entrada 130.
[10] Véase, SUMAC, Entrada 132.
[11] Véase, apéndice del Recurso, pág. 285-288.

naturaleza técnica que requería discutirlo con su perito para así poder presentar la oposición. No empece a esto, expresó que el aludido perito no estaba disponible para reunión hasta el 27 de marzo de 2024, por lo cual solicitó un prórroga de treinta (30) días para presentar la oposición a la solicitud de sentencia sumaria. Por su parte, el 20 de marzo de 2024, la señora Peña, presentó *Oposición a la Tercera "Moción de Prórroga" de la Demanda para Responder la "Moción de Sentencia Sumaria" y para que dé por Sometida Dicha Sentencia Sumaria.*[12] Mediante este escrito, esgrimió que ya habían transcurrido ochenta y ocho (88) días desde que se presentó la solicitud de sentencia sumaria parcial y que la petición de prórroga presentada por la AEE era injustificada. Por consiguiente, solicitó que el foro primario diera por sometida la referida moción de sentencia sumaria sin oposición de la Peticionaria. Examinados estos escritos, el 21 de marzo de 2024, el foro *a quo* emitió *Orden* en la cual, entre otros asuntos, declaró *No Ha Lugar a* la solicitud de una tercera prórroga para presentar la oposición de la solicitud de sentencia sumaria, por lo que dio por sometida la mencionada moción sin oposición.[13]

Inconforme con esta decisión, el 5 de abril de 2024, la AEE presentó *Moción de Reconsideración.*[14] En lo pertinente, la Peticionaria reiteró su postura en cuanto a que las prórrogas presentadas estaban justificadas y que el no permitirle presentar su escrito de oposición contravenía la política pública de que los casos se ventilen en sus méritos. Tras varios trámites procesales, el 23 de abril de 2023, el foro primario notificó *Orden,*[15] en la cual declaró *No Ha Lugar* la moción de reconsideración para una tercera prórroga para presentar oposición a solicitud de sentencia

---

[12] *Íd.*, págs. 290-296.
[13] *Íd.*, págs. 301-302
[14] *Íd.*, págs. 360-365.
[15] *Íd.*, pág. 374.

sumaria. Enfatizó que el 31 de enero de 2024, se le había advertido a la AEE que no concederían más prórrogas.[16]

Continuado los procedimientos, el 7 de octubre de 2024, el foro primario emitió *Sentencia Parcial*.[17] Por virtud de esta, el foro *a quo* formuló las siguientes determinaciones de hechos:

1. El 22 de enero de 2021, la señora Peña presentó la Demanda de marras, acompañada con el emplazamiento de la codemandada, AEE.

2. El 23 de febrero de 2021, se emplazó personalmente a un representante autorizado de la AEE.

3. La codemandada, AEE, es una corporación pública e instrumentalidad gubernamental autónoma del Estado Libre Asociado de Puerto Rico, creada en virtud de la Ley Núm. 83-1941, 22 LPRA sección 193(a). La dirección física de la AEE es Ave. Ponce de León 1110, Pda. 16 ½, Santurce, Puerto Rico y postal es PO Box 364267, San Juan, Puerto Rico 00936- 4267, y su teléfono es (787) 521-3434.

4. El 23 de enero de 2020, el Sargento José A. López Rodríguez, Placa Núm. 8-27158 y la Agente Gladynel Pérez Medina, Placa Núm. 28075, crearon la Querella Núm. 2020:7-311:000544, por motivo de la muerte del Sr. Yabril Alexander Medrano Peña, quien falleció electrocutado cuando hizo contacto con una línea abierta de 2,400 voltios de la AEE, mientras realizaba trabajos cerca del acondicionador de aire, localizado en el techo del edificio donde estuvo ubicado el negocio Betances Cash & Carry, en la avenida Dr. Ramón Emeterio Betances, en Bayamón.

5. La Fiscal Jeryma E. Cabrera Molina emitió la boleta de autopsia y autorizó al Forense al levantamiento del cadáver del Sr. Yabril Alexander Medrano Peña t/c/c Yadiel Alexander Medrano Peña, del techo del edificio donde estuvo ubicado el negocio Betances Cash & Carry, en la avenida Dr. Ramón Emeterio Betances, en Bayamón.

6. El 15 de marzo de 2022, la Sra. Heriberta Peña, otorgó la Declaración Jurada, Affidávit Núm. 18295, ante el Notario Público Celso Lorenzo Gutiérrez. Solo citaremos los incisos pertinentes a la controversia ante nuestra consideración:

   2) Mi dirección física y postal es la calle Cañada, #1268, Urb. Puerto Nuevo, 810, San Juan, Puerto Rico 00920.

   3) Mi hijo se llamaba Yabril Alexander Medrano Peña. Nació el 2 de febrero de 1990.

   5) Yabril Alexander Medrano Peña era mi único hijo.

   7) Yabril Alexander Medrano Peña vivía conmigo, me daba el cariño que toda madre añora recibir de un hijo.

   8) Yabril Alexander Medrano Peña siempre estaba pendiente de que yo estuviera bien y me ayudaba en los quehaceres y cuidado del hogar.

---

[16] *Íd.*
[17] *Íd.*, págs. 376-408.

9) La muerte de mi hijo Yabril Alexander Medrano Peña me ha provocado grandes angustias y sufrimientos de los que puedo testificar.

7. El 2 de febrero de 1990, nació el Finado Yabril Alexander Medrano Peña, en Santo Domingo y al momento de su muerte, ocasionada por un accidente con el tendido eléctrico perteneciente a la AEE, tenía 29 años de edad.

8. El 25 de diciembre de 2020, la Dra. Hilary McElligott, M.D. del Instituto de Ciencias Forenses realizó una autopsia al cuerpo del Sr. Yabril Alexander Medrano Peña. Luego de realizar la autopsia al cuerpo del Sr. Yabril Alexander Medrano Peña, emitió el *Medical Forensic – Report*, Pat-0378-20, de la Querella Núm. 2020:7-311:000544.

9. En el Medical Forensic – Report, la Dra. Hilary McElligott concluyó que el Sr. Yabril Alexander Medrano Peña falleció como resultado de electrocución, debido al contacto con un cable de alto voltaje. Las observaciones notables de la autopsia son las siguientes:

EVIDENCE OF INJURY LOWER EXTREMITIES:

On the anterior aspect of the left lower leg there is an electrical burn, approximately 2.5 inches x 1.5 inches with charred irregular margins that extends to the underlying tendons and muscle. Superior to this, there is charring of the skin, a superficial electrical burn (approx. 0.6- inch in greatest diameter) and then superior to this on the mid lower leg, there is an electrical burn with superficial charring, approximately 1.5 inches x 1.0-inch involving the subcutaneous fat.

SIGNIFICANT FINDINGS AT AUTOPSY INCLUDE:

a) Electrical burns to left lower leg

b) Congestion of viscera

c) Pulmonary edema and congestion In light of the historical and gross autopsy findings, it is the opinion of the prosectors that the decedent died as the result of electrocution due to contact with a high voltage cable. Furthermore, the manner of death is best deemed accident.

FINAL AUTOPSY DIAGNOSES:

• Electrical burns of left lower leg

• Congestion of Viscera

• Pulmonary cerebral edema

10. El Sr. Luis Alberto Andújar Oyola (señor Luis Andújar), testificó que, para enero de 2020, era Supervisor de Líneas Intermedio, en el Bayamón Transmission Center o Centro de Despacho de Servicios Bayamón de la AEE, mejor conocido por sus iniciales BTC. El trabajo del BTC consiste en restablecer el servicio eléctrico; o sea, la reconexión de la electricidad, porque se va la luz eléctrica en un sector de su área de trabajo. Indicó que Puerto Rico se divide en distintos *Transmission Center* o Centro de Despacho de Servicios y cada uno es responsable de un área geográfica específica. Véase las págs. 14-30 de la Deposición del señor Luis Andújar del 16 de febrero de 2023. Véase en las págs. 14- 30 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

11. El señor Luis Andújar declaró que la Oficina Técnica de Bayamón de la AEE es la sección de operación y mantenimiento que está encargada de reparar postes, alambres en el piso, desganche, quitar árboles, sustitución de postes rotos, ya sea que han caído al piso o sobre las líneas eléctricas. Véase en las págs. 18 - 30 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

12. El señor Luis Andújar testificó que las líneas de distribución de luz eléctrica en Puerto Rico son de hasta 13,200 voltios, ya que son trifásicas. Véase las págs. 16-17 de la Deposición del Sr. Luis Andújar del 16 de febrero de 2023.

13. El 23 de enero de 2020, el señor Luis Andújar declaró que acudió al lugar donde falleció el Sr. Yabril Alexander Medrano Peña, ahí tomó fotos del tendido eléctrico, postes, grúas, edificios aledaños, donde ocurrió el accidente, paramédicos, policía y del occiso. El señor Luis Andújar autentificó las referidas fotos durante su deposición y describió que muestran dichas imágenes y las mismas fueron marcadas como Exhibits. Véase las págs. 33 – 140 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

14. El señor Luis Andújar declaró que las fotos muestran el área quemada en la pierna del Finado Yabril Alexander Medrano Peña que muestra que este tocó un tramo de la línea eléctrica trifásica de la AEE que fue la que provocó el accidente. Señaló que parte de la línea eléctrica trifásica de distribución de la AEE está transcurriendo desde el poste de electricidad y el cable eléctrico pasando bien pegado al techo del edificio. El referido cable eléctrico tiene dos (2) aisladores o sea dos (2) tubos que están tocando el metal del techo del edificio, donde se ve el cuerpo inerte del Finado Yabril Alexander Medrano Peña. Véase las págs. 33-103 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

15. El señor Luis Andújar manifestó que en el momento que la parte inferior de la pierna del Finado Yabril Alexander Medrano Peña tocó la línea eléctrica que discurría por parte del techo del antiguo negocio Betances Cash & Carry, pudo haber ocurrido una de estas posibilidades: 1) se pudo haber ido la luz, ya que eso funde el fusible; o 2) la electricidad pudo haber pasado dependiendo del voltaje de la línea. Véase las págs. 45-64, 98-103 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

16. El 24 de enero de 2020, el señor Luis Andújar preparó un informe del incidente de la muerte del Sr. Finado Yabril Alexander Medrano Peña, donde indicó lo siguiente:

    El empleado caminando, se acercó a una invasión de servidumbre de paso por parte del edificio, y no se percató o tal vez por desconocimiento, se acercó a la línea trifásica de la Autoridad de Energía Eléctrica de 4,160 voltios, haciendo contacto con la parte inferior de la pierna izquierda. Véase las págs. 98-103 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

17. El señor Luis Andújar declaró que una línea triásica de 4,160 voltios debe tener como mínimo de despeje diez pies de distancia de despeje de la línea eléctrica a cada lado del edificio a otro; o sea, diez pies de despeje para cada lado de la línea eléctrica. Pero, aceptó que la AEE

en ocasiones solo deja 5 pies de área de despeje entre la línea y un edificio. Manifestó que la AEE no construye por encima de ningún edificio. Véase las págs. 103-105 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

18. El señor Luis Andújar testificó al ver las fotos identificadas Exhibits 7 y 8, que la línea eléctrica de distribución que provocó la muerte del Sr. Yabril Alexander Medrano Peña es de alambre hard drone bare; o sea, alambre núm. 6 ó 2 de grueso y no tiene cubierta de aislante de electricidad en toda la línea. Manifestó que el alambre drone bare se usaba en el tiempo de los dinosaurios; o sea, es bien viejo del año 1995. Véase las págs. 104-108 y 132-136 de la deposición del señor Luis Andújar del 16 de febrero de 2023 y los Anejos 5 – 6.

19. El Tribunal al examinar las fotos que constituyen los Exhibits 7 y 8 pudo observar que el techo del antiguo negocio Betances Cash & Carry esta sucio, por lo que es de color negruzco y el cable del tendido eléctrico de la AEE discurre por dos puntos distintos de dicho techo. El cable es de 2 a 6 pulgadas de grueso no está aislado, es de color gris, queda a unas pocas pulgadas del techo y es difícil el verlo a simple vista, debido a que el color del techo y cable son ambos de color oscuro. Tanto el poste como gran parte de los cables eléctricos que sale del mismo está cubierto de una enredadera o maleza muy frondosa, por lo que ni el poste y muchas de sus líneas eléctricas no son visibles y para un ciudadano promedio pueden parecer ramas de un árbol o líneas de teléfono o cable tv cubiertas de maleza. Una persona promedio que esta por primera vez en el lugar no sabría que la maleza que está a su vista cubre totalmente un poste y gran parte del tendido eléctrico. El cable eléctrico de metal que discurre por parte del techo del edificio no llama la atención, por lo que, si la persona desconoce de su existencia o se encuentra trabajando en el lugar, es posible que no se percate del mismo.

20. El señor Luis Andújar declaró que la línea es más vieja que el edificio, pero aceptó que el edificio tiene muchos años de construido, pero menos que la edad del poste de madera. El señor Luis Andújar basó su respuesta en que la AEE no construye así invadiendo servidumbres por encima de los techos. Indicó que ese tipo de alambre eléctrico se dejó de usar hace más de 25 años. Manifestó que cuando entró a trabajar en la AEE nunca ha visto un rollo de ese tipo de alambre. Reiteró que desde mucho antes de que él empezara a trabajar con la AEE se dejó de usar ese tipo de alambre y el rollo de tensor ahí nunca lo había visto. Véase las págs. 104-110 de la deposición del señor Luis Andújar del 16 de febrero de 2023.

21. La línea eléctrica que provocó la muerte del Sr. Yabril Alexander Medrano Peña es una línea de alto voltaje primaria. Véase las págs. 15-17 de la deposición del señor Luis Andújar del 16 de febrero de 2023.

22. El alimentador o feeder que está en el poste de madera en la esquina posterior del edificio donde trabajaba el Finado Yabril Alexander Medrano Peña, y de donde salía la línea de distribución que provocó su muerte, es el alimentador 1705-03 o feeder 1705-03. Véase las págs. 149-150 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

23. Alimentador o electric feeder es definido de la siguiente manera: a set of conductors that carry electric power from the service equipment (or from a transformer secondary, a battery bank, or a generator switchboard where power is generated on the premises) to the overcurrent protective devices for branch circuits supplying the various loads. Basically stated, any conductors between the service, separately derived system, or other source of supply and the branch-circuit protective devices are feeders.

24. El señor Luis Andújar explica cuál es el proceso que se sigue cuando se revisa un poste y la línea de tendido eléctrico, ya sea por motivo de una avería, mantenimiento o inspección. El personal de la AEE que realiza la inspección tiene que hacer un informe o reporte, donde narran sus hallazgos, y si cambiaron alguna pieza dañada o si hay que reemplazarla:

> Van y chequean el poste. Verifican, eso viene como un tipo de martillito, plan, plan, plan. Tocan y te verifican todo. Chequean la carpulina. La carpunila es el aceite que ellos tienen por dentro. Todo eso que esté todo bien, que esté todo tranquilo, que esté todo en condiciones, que tenga sus tensores, discos y todo. Verifican los cables y la línea de distribución completa y se indica y remplaza cualquier pieza mala, el cable hard drone es del año 1995, se inspeccionan los discos, la cruz y los circuitos ya está. Cada vez que se realiza una inspección se le clava al poste una chapa aguantada con dos clavos de dos pulgadas que indica el año en que se realizó. En algunas ocasiones esta chapa se cae ya sea por el pasar del tiempo o cuando el empleado de la autoridad sube al poste se cae o la arranca. Véase las págs. 132-142 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

25. El señor Luis Andújar testificó que la AEE mantiene un récord de todas las inspecciones y mantenimientos realizados de cada poste de la AEE. La información que necesita la AEE es identificar el poste en cuestión, según su ubicación. Véase las págs. 139-142 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

26. El señor Luis Andújar declaró que si una persona quiere conocer el récord de inspección y mantenimiento del poste involucrado en la muerte accidental del Sr. Yabril Alexander Medrano Peña hay que solicitarle a la AEE el récord del poste que está en el antiguo Cash & Carry, en la Avenida Betances, Calle 3A, el que está en la esquina y la AEE tenía un sistema llamado Storm que rastrea dicha información. El sistema Storm de la AEE funcionaba como Google Map, le ponías información lo cliqueabas y te llevaba al poste y lo identificaba por número. Él entiende que el personal de cartografía que son los que bregan con los postes y alimentadores tienen esa información y los mismos están identificados con un número. Por ejemplo, 17105, este es el 5 de la 17. El 17 es la subestación, y este es el 5. Véase las págs. 139-144 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

27. Desde junio del año 1997, el Ing. Jorge L. Bauzó Álamo de la AEE aprobó el *Procedimiento Técnico de Distribución Núm. 0-588-14* que estableció el *Procedimiento Para la Notificación de Situaciones*

*Peligrosas* (Procedimiento Para la Notificación de Situaciones Peligrosas Núm. 0-588-14)

28. La pág. 1 del *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588-14 establece que en su introducción y propósito lo siguiente:

   **A. Introducción**

   Las situaciones peligrosas constituyen un riesgo para la vida y propiedad y atentan contra la confiabilidad del sistema eléctrico. Para evitar estas situaciones, los equipos, propiedades y procesos tienen que mantenerse bajo las medidas de seguridad que apliquen a cada caso. Toda condición o práctica insegura que pueda causar daño a una persona o propiedad se considera una situación peligrosa y hay que corregirla lo más pronto posible. Los empleados de la Autoridad tienen la responsabilidad de notificar a la oficina, sección o Distrito Técnico correspondiente sobre cualquier situación que se considere peligrosa para que pueda ser corregida. Este procedimiento establece las pautas a seguir para informar situaciones peligrosas creadas por varios factores como construcciones, descuidos del público, accidentes, deterioro de equipos y materiales, etc.

   **B. Propósito**

   Proveer un método efectivo para informar las distintas situaciones peligrosas y así corregir, modificar, referir y dar el seguimiento necesario para eliminar o minimizar todo lo que pueda constituir un riesgo al público en general, a los empleados y propiedad y al Sistema de Transmisión y Distribución. Anejo 7, p. 3.

29. El *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588- 14, en la pág. 4, define una situación peligrosa como una condición que constituye un riesgo o atenta contra la confiabilidad del sistema eléctrico o la vida y propiedad de empleados y público en general.

30. El *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588- 14, en la pág. 4, establece que será responsabilidad del personal de la Autoridad de Energía Eléctrica de informar cualquier situación peligrosa de la que tenga conocimiento a la oficina o distrito técnico correspondiente, utilizando el formulario Notificación de Situaciones Peligrosas.

31. El *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588- 14, en la págs. 4 - 14, establece un proceso detallado para los empleados, supervisores respondan a las situaciones de peligro, para evaluarlas y corregir cualquier situación de peligro y notificar de la misma utilizando el formulario Notificación de Situaciones Peligrosas.

32. El *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588- 14, en la págs. 5 – 14 establece que el ingeniero o supervisor asignado será responsable de realizar una inspección cotejando todos los detalles. Entre los detalles que debe cotejar, se encuentran los siguientes puntos pertinentes a nuestra controversia:

   1) Tanto los edificios y estructuras existentes como los proyectos en desarrollo tienen que cumplir con los siguientes despejos mínimos horizontales entre los conductores y las paredes o

proyecciones de los edificios, ventanas, balcones y áreas accesibles a transeúntes:

0-750 voltios – 5.5 pies

751 v – 15 KV – 7.5 pies

38 KV – 8 pies

115 KV – 10 pies

230 KV – 12 pies

2) Para proyectos en desarrollo no está permitido que las líneas pasen sobre edificios o estructuras. **En los casos de líneas sobre estructuras existentes estas deberán reubicarse.** En áreas críticas, donde no sea factible la reubicación de las líneas, como por ejemplo en El Viejo San Juan, se tiene que cumplir con los despejos mínimos verticales. La distancia vertical de distribución es:

a) Sobre o bajo techos o proyecciones no accesibles a transeúntes:

0 – 750 voltios – 11.5 pies

751 v – 15 KV – 13.5 pies

b) **Sobre o bajo balcones y techos accesible a transeúntes:**

750 voltios 11.5 pies

**751 v – 15 KV – 13.5 pies**

3) **La distancia mínima diagonal sobre techos, sobre o bajo proyecciones de edificios, rótulos o estructuras tiene que cumplir con el requisito de despejo horizontal hasta el punto donde ésta sea igual al despejo mínimo vertical. De este punto en adelante el despejo diagonal será igual al despejo vertical**.

24) **Invasión a servidumbres de paso.** Notificar inmediatamente a la Administración de Reglamentos y Permisos (ARPE) para que se verifiquen los permisos de construcción y a la oficina más cercana de OSHA.

33. El *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588- 14, en las págs. 5 – 14 establece que las líneas eléctricas de la AEE tienen que estar despejadas de las estructuras un mínimo de entre 5.5 pies y 12 pies.

34. El *Procedimiento Para la Notificación de Situaciones Peligrosas Núm.* 0-588- 14, en las págs. 4 – 8 y 14 establece que una línea primaria de distribución de alto voltaje (750 a 15,000 voltios) que está en un *space or way accesible to pedestrians only* debe estar despejada horizontalmente entre 12 pies y 17 pies y 6 pulgadas de toda estructura.

35. El señor Luis Andújar testificó, en relación a las reparaciones del Huracán María, cuando todo el sistema eléctrico de Puerto Rico se apagó, lo siguiente:

Lo que pasa es que las reparaciones del Huracán María ahí vinieron gringos y dieron to' y los gringos repararon y se fueron. Y muchos de ellos tenían que informar cosas, y a veces no las informaron, ¿entiende? Pero, pues casi siempre ellos tenían supervisores de aquí de Puerto Rico, que esos eran los que llevaban el conteo de todo. Véase las págs.

144-145 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

36. El señor Luis Andújar declaró que, luego del Huracán María todos los transformadores que están en los postes fueron inspeccionados o *assessments*, ya que todo el tendido eléctrico de Puerto Rico se apagó. Véase págs.144-145 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

37. El alimentador 1705, el tres (3); o sea, 1705-03 es el que está ubicado en el Cash & Carry en Hermanas Dávila, donde ocurrió el accidente con un cable de electricidad, perteneciente a la AEE que causó la muerte del Sr. Yabril Medrano Peña. Véase las págs. 60 -90 y 144-150 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

38. El señor Luis Andújar testificó que el personal de la AEE que se le asignó el alimentador 1705-03, tenía que ir desde la subestación y patrullar el alimentador hasta el final; o sea, la línea trifásica, monofásica, postes, inspeccionarlo todo, chequearlo todo y eso constituye un assessment para la AEE. El señor Luis Andújar narró un ejemplo de lo que constituye un *assessment* de la siguiente manera:

> Mira, en tal punto, en tal punto, con lo que he hecho y todo, están las deficiencias. Y hay que corregirlas. No puedes meter el alimentador o no puedes energizar todo si no has corregido eso.

> Yo voy patrullándolo. Si el alimentador hace así, y hace así y hace así, yo voy patrullándolo el alimentador, y digo: Mira, hasta aquí está bueno. Vamos a hacer la operación hasta aquí, energizamos hasta aquí, y dejamos abierto de aquí para allá, y seguimos. Y sigo seccionalizándolo para que la gente vaya teniendo luz. Claro. Recuperando la electricidad poco a poco. Ese es el punto.

> Okey. ¿Y en ese proceso, como parte de ese proceso, eso incluye inspeccionar los postes? Bueno, tú los miras, porque acuérdate que... ya que estás ahí, tú miras que todo esté bien, ¿me entiendes? Porque nunca está de más un *double check*.

> ¿Y esos transformadores no hay que verificarlos 8 de alguna manera específica? No, los verifico que esté todo conectado, el bajante primario, los bajantes secundarios, está todo bien, están groundiados. Está todo bien. Tiene la varilla de tierra, tiene el balance de tierra, tiene todo, sabes. No, el transformador está bueno, está conectado. La parte de arriba bien tiene la caja, está buena la caja, el bajante de caja está bueno, de línea a caja, de caja a línea está bueno. Sí, está to' bien, eso está bien.

> ¿Ese trabajo de esa inspección de esa área particularmente después luego de que se hace esa inspección, se prepara un informe? Sí, el supervisor que está lo prepara, lo verifica. Por ejemplo, yo cuando me toca a mí yo lo hago. Esto está bien, esto está bien, todo... Y para tú energizar, acuérdate que para tú energizar tienes que tener unas órdenes, y la Distribución te pide: Dame, dame, dame, y yo tengo que... yo no puedo fallar. Si yo voy a energizar de aquí a aquí, yo no puedo fallar. Véase las págs. 144-150 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

39. El señor Luis Andújar aceptó que, si el personal que hace un assessment percibe una situación anómala, en cuanto a las líneas del tendido eléctrico o por donde discurre el mismo, incluyendo cualquiera de sus componentes tiene que recogerlo en su informe. O sea, que, si el personal de la AEE ve que una línea está transcurriendo por un techo, lo tiene que anotar dentro del *assessment*. Véase las págs. 144-150 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

40. Para corregir la línea 1705-03, el personal de la AEE patrulló todo el alimentador hasta el final.

41. La palabra alimentador significa para la AEE toda la línea, incluyendo patrullarlo todo. Inspeccionarlo todo, chequearlo todo, que esté todo bien y eso es un *assessment*, identificar las deficiencias en la línea y corregirla, porque no puedes meter el alimentador o no puedes energizar todo si no has corregido eso. Esa inspección también incluye inspeccionar los postes verificando que todo esté bien, verificando que, en los transformadores, que son parte del alimentador en el poste, esté todo conectado. Véase las págs. 144-150 de la Deposición del señor Luis Andújar del 16 de febrero de 2023.

42. El 8 de enero de 2018, a las 11:12 am, el Sr. Carlos Alvarado Torres, Jefe de Operaciones Técnicas de la AEE preparó un informe sobre las reparaciones realizadas por la AEE, luego del Huracán María para conocimiento de los abonados y medios noticiosos titulado Lo Que Están *Haciendo Nuestras Brigadas....* En la pág. 2 surge que el 8 de enero de 2018, tres (3) brigadas de la AEE trabajaron con la línea 1705-03 de la Ave. Betances de Bayamón detrás del Laundromat repararon las líneas primarias y secundarias para energizar la estación de bomberos.

43. El 9 de enero de 2018, a las 11:00 am, el Sr. Carlos Alvarado Torres, preparó otro informe sobre las reparaciones realizadas, luego del Huracán María titulado *Lo Que Están Haciendo Nuestras Brigadas....* En la pág. 2 surge que el 13 de enero de 2018, nuevamente dos (2) brigadas de la AEE trabajaron con la línea 1705-03 de la Ave. Betances de Bayamón detrás del Laundromat para continuar reparando las líneas primarias y secundarias para energizar la estación de bomberos.

44. El 23 de enero de 2018, a las 11: 43 am, el Sr. Carlos Alvarado Torres, preparó otro informe sobre las reparaciones realizadas luego del Huracán María titulado *Lo Que Están Haciendo Nuestras Brigadas....* En la pág. 3 surge que el 24 de enero de 2018, tres (3) brigadas de la AEE continuaron trabajando con la línea 1705-03, de la Calle F, Urb. Hermanas Dávila de Bayamón reparando las líneas primarias y secundarias.

45. El 14 de agosto de 2020, el Sr. Carlos Perdomo Cheyne (señor Perdomo), envió una carta dirigida al Ing. Yamil Rivera Hernández, Superintendente del Departamento de Ingeniería de Distribución de la AEE, referente a Antártica Ice Plant Corp., cuenta núm. 0051390146, solicitándole una reconsideración:

> Por este medio acusamos recibo de su carta del pasado 1 de julio de 2020, recibida el pasado 18 de julio de 2020 relacionada a Antártica Ice Plant Corp.; número de cuenta 0051390146. Conforme a lo

suscrito en su carta sirva la presente para oponernos a lo suscrito en la misma y solicitar reconsideración.

En el 1986, adquirí la planta de hielo Antártica, localizada en la calle 3A#140 de Hermanos Dávila, Bayamón, marcado como edificio B. En el 1986, se adquirió el edificio en las mismas condiciones en que se encuentra al presente. En otras palabras, desde el 1986, este edificio se encuentra "AS IS" desde que se adquirió el mismo, y no se le han hecho cambios ni modificaciones algunas. Desde en o antes del 1986, la Autoridad de Energía Eléctrica (AEE) tenía pleno conocimiento de la situación del tendido eléctrico que enfrentaba el sector y permitió a su vista y paciencia que todos los vecinos del área cambiaran las condiciones existentes sin tomar ningún tipo de acción. Ahora, posteriormente a un lamentable accidente, la AEE pretende que los que adquirimos las propiedades hace más de 34 años reparemos lo que la AEE permitió. El haber esperado más de 34 años para emprender un reclamo de un cobro para el cambio de cablería del sistema del tendido eléctrico es incuria y abandono de su derecho.

[...]

46. El 15 de septiembre de 2023, el señor Perdomo suscribió una Declaración Jurada, Testimonio Núm. 275, ante el Notario Público Jorge Alberto López Olea, donde declaró lo siguiente:

    [...]

    1) Que en el año 1986 compre la planta Antartica Ice Plant Corp. Localizada en la Calle 3A #140, marcado como Edificio B, del Bloque 1, de la Urb. Hermanas Dávila en Bayamón, PR, 00959.

    2) Que desde que adquirí la propiedad en el 1986, las condiciones estructurales del que fue mi edificio por 37 años, entiéndase hasta abril de 2023, y de las líneas eléctricas que pasan entre el edificio "C" y el "B", siempre han sido las mismas.

    3) Que personalmente vi en más de una ocasión y antes del 2020, a personal de la Autoridad de Energía Eléctrica colocando "aisladores" sobre partes del cableado que discurría cerca y sobre el techo del Edificio "C", conocido como 'Betances Cash & Carry'".

    4) Que a través de los 37 años que operé mi planta de hielo, pude ver en un sinnúmero de ocasiones a personal de la Autoridad de Energía Eléctrica ("AEE") trabajar, reparar y/o darle mantenimiento a las líneas que discurren entre los Edificios A, C, B y D del Bloque 1 de Hermanas Dávila, especialmente tras el paso del Huracán María.

    5) Que hago esta declaración jurada para certificar que me consta de propio y personal conocimiento que por los pasados 37 años fui el propietario de la Planta de Hielo Antártica, ubicada en el Edificio "B" del Bloque 1 de Hermanas Dávila y puedo certificar de propio y personal conocimiento que durante todos esos años el personal de la A.E.E. tenía conocimiento de las condiciones de las líneas eléctricas que transcurren entre los Edificios A, C, B y D de Hermanas Dávila ya que sus brigadas y/o

personal siempre han realizado trabajos sobre las mismas y ahora lo siguen haciendo como LUMA.

47. El 15 de septiembre de 2023, la Sra. Annette Martínez Negrón, prestó una Declaración Jurada, Testimonio Núm. 274, ante el Notario Público Jorge Alberto López Olea, donde declaró lo siguiente:

[...]

2) Que llevo más de diez años laborando como gerente del establecimiento comercial Super Ahorros Eliud, localizado en la Urb. Hermanas Dávila, Edificio D, # 2600, Bayamón, PR 00959.

3) Que por la parte trasera del Edificio D transcurren líneas eléctricas propiedad de la entonces Autoridad de Energía Eléctrica ahora LUMA.

4) Que constantemente y a través de los diez años que llevo trabajando como gerente del establecimiento comercial Super Ahorros Eliud, cada vez que ha habido y/o hay problemas con el servicio de energía eléctrica, ha sido el personal y/o brigadas de la Autoridad de Energía Eléctrica (AEE ahora LUMA) quienes se han personado para trabajar con las líneas eléctricas y reestablecer el servicio.

5) Que lo anterior me consta de propio y personal conocimiento ya que a través de los diez años que llevo siendo la gerente del comercio Super Ahorros Eliud, en innumerables ocasiones en que el personal y/o las brigadas de la entonces AEE ahora LUMA han necesitado acceso a través del Edificio D, para llegar a las líneas eléctricas que transcurren por la parte trasera del Edificio, he sido yo quien se los ha brindado.

6) Que hago esta declaración jurada para certificar que me consta de propio y personal conocimiento que por los pasados diez (10) años que llevo trabajando en el negocio Super Ahorros Eliud, ubicado en el Edificio D, de la Avenida Betances en Bayamón, Puerto Rico, que previo y después de enero del año 2020, he visto y les he dado acceso a las brigadas de la entonces Autoridad de Energía Eléctrica (AEE) ahora LUMA para que puedan trabajar, y/o reparar cualquier situación que ellos entendieran con las líneas que trascurren por la parte trasera del Edificio D.

48. Desde octubre del año 1999, el Ing. Jorge L. Bauzó Álamo, de la AEE, aprobó y entró en vigor desde el Procedimiento Técnico de Distribución titulado Procedimiento Núm. 2-593-04 titulado *Procedimiento Para la Inspección y Conservación De Alimentadores Aéreos y Soterrados* (Procedimiento Núm. 2-593-04).

49. En las págs. 1-17 del *Procedimiento Núm. 2-593-04*, establece en su introducción y propósito es uniformizar la inspección y conservación preventiva de los alimentadores aéreos y soterrados del sistema de distribución, basado en el Programa Anual de Conservación Para el Sistema Aéreo y Soterrado. Dichos programas tienen el fin de prevenir y corregir cualquier situación que eventualmente pueda ocasionar una interrupción en el sistema eléctrico. Establece, paso a paso, el proceso de inspección, cada cuánto tiempo se tiene que llevar a cabo, los informes a prepararse de las

inspecciones realizadas y el programa de inspección mensual a llevarse a cabo, materiales utilizados, reparaciones realizadas y que se tiene que utilizar el formulario *Informe de Inspecciones de Alimentadores Aéreos y Soterrados*. El personal de la AEE tiene la responsabilidad de detectar y corregir cualquier situación crítica que eventualmente pueda ocasionar una interrupción al sistema eléctrico y establece todos los puntos a inspeccionar y corregir de manera detallada. Las deficiencias que no puedan ser corregidas durante la inspección deberán ser referidas a la sección correspondiente para su reparación final.

50. En la pág. 3 del Procedimiento *Núm.* 2-593-04, define que un alimentador aéreo es una línea de alimentación primaria suspendida a una altura en los patrones de construcción, por medio de postes o estructuras.

51. En la pág. 4 del *Procedimiento Núm.* 2-593-04 se establece que el ciclo de conservación para cada alimentador del distrito será de tres años.

52. La línea 1705-03 fue la involucrada en el accidente que causó la muerte del Sr. Yabril Alexander Medrano, la misma no cumple con los parámetros establecidos en el *Procedimiento Para la Notificación de Situaciones Peligrosas* Núm. 0-588-14, según demuestran las fotos de la escena y toda la documentación que obra en autos.[18]

Cónsono con estas determinaciones de hechos, el foro primario dispuso que la AEE fue negligente al conocer, pero no corregir la situación peligrosa que provocaba su línea de distribución, la cual discurría sobre el techo del edificio. Ello se fundamentó en que, en múltiples ocasiones, brigadas de la AEE trabajaron la línea en controversia y tenían el deber ministerial de tomar acciones correctivas. Concluyó que tal omisión terminó ocasionada la muerte del señor Medrano. Asimismo, el foro primario determinó que:

> El Tribunal concluye que la causa próxima del accidente que ocasionó la muerte de Yabril Medrano Peña, mientras estaba en el techo del Edificio C para realizar trabajos fue la línea de distribución de la AEE que constituía un craso peligro para la ciudadanía. A su vez, la AEE violó sus procedimientos técnicos que establecían que tenían una obligación ministerial de corregir dicha situación existente con el tendido eléctrico que discurría por parte del techo del Edificio C, por lo que, al incumplir con dicho deber, el tendido eléctrico perteneciente a la AEE causó que el Sr. Yabril Medrano muriera electrocutado por la temeraria negligencia de la AEE.[19]

---

[18] *Íd.*, págs. 379-393.
[19] *Íd.*, pág. 408.

Oportunamente, el 22 de octubre de 2024, la AEE presentó *Solicitud de Reconsideración de Sentencia*.[20] En esta, reiteró su posición en cuanto a que un tercero realizó una expansión del edificio que invadió la línea aérea de los cables de la AEE, la cual creó la condición de peligrosidad que en conjunto con la propia negligencia del señor Medrano, permitió el contacto eléctrico que le causó la muerte. De igual manera, la Peticionaria impugnó una serie de determinaciones de hechos presentes en la *Sentencia Parcial.*

Por su parte, el 13 de noviembre de 2024, la señora Peña presentó *Moción de Prórroga para Presentar Oposición a la Solicitud de Reconsideración de la Sentencia" en el SUMAC Núm. 160*,[21] mediante la cual, solicitó una prórroga de treinta y siete (37) días hasta el 20 de diciembre de 2024. Ese mismo día, el foro primario declaró *Ha Lugar* la prórroga solicitada.[22] Ulteriormente, el 19 de diciembre de 2024, la señora Peña presentó *Moción de Breve y Final Prórroga de 5 días Laborables para Presentar Oposición a la "Solicitud de Reconsideración de la Sentencia" en el SUMAC Núm. 160*,[23] la cual fue declarada *Ha Lugar* por el foro *a quo*.[24] Subsiguientemente, el 30 de diciembre de 2024, la señora Peña presentó *Moción en Oposición a la Reconsideración de la Sentencia Sumaria Parcial*.[25] En esta, esencialmente, reiteró su postura en torno a que la AEE fue responsable por la muerte del señor Medrano.

Ponderado ambos escritos, el 15 de enero de 2025, notificado el 16 de enero del mismo año, el foro primario emitió *Resolución*

---

[20] *Íd.*, págs. 409-480.
[21] *Íd.*, págs. 600-601.
[22] *Íd.*, pág. 602.
[23] *Íd.*, págs. 606-608.
[24] *Íd.*, pág. 609.
[25] *Íd.*, pág. 611-654.

*Interlocutoria* en la que declaró *No Ha Lugar* la moción de reconsideración presentada por la AEE.[26]

Aun inconforme, el 18 de febrero de 2025, la AEE presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> Erró el TPI al no reconsiderar su Sentencia Parcial, en la cual emitió determinaciones de hechos omitiendo considerar la negligencia atribuible al Sr. Medrano, su patrono y/o el dueño del Edificio cuya negligencia fue la causa próxima del accidente que resultó en la muerte del Sr. Medrano.

> Erró el TPI al no reconsiderar su Sentencia Parcial, en la cual emitió determinaciones de hechos no sustentada en la prueba suministrada en apoyo del hecho propuesto.

> Erró el TPI al denegar la prórroga, oportuna y debidamente fundamentada, solicitada por la AEE para presentar su oposición a la moción de sentencia sumaria de la Apelada.

El 25 de febrero de 2025, emitimos *Resolución* en la que, entre otros asuntos, concedimos un término de treinta (30) días a la señora Peña para que expusiera su posición en torno al recurso. Oportunamente, el 4 de abril de 2025, la Recurrida presentó *Oposición a Apelación.* En esta reiteró que las determinaciones de hechos formuladas por el foro primario estaban sustentadas en evidencia, que el foro *a quo* y que el foro *a quo* no incidió al no conceder prórrogas adicionales a la AEE para que presentara la oposición a la solicitud de sentencia sumaria. Con el beneficio de la comparecencia de ambas partes, procedemos a exponer la normativa jurídica aplicable a la controversia objeto del recurso de epígrafe.

## II.
### *A. Certiorari*

"[U]na resolución u orden interlocutoria, distinto a una sentencia, es revisable mediante *certiorari* ante el Tribunal de Apelaciones". *JMG Investment v. ELA et al.,* 203 DPR 708, 718

---

[26] *Íd.*, pág. 705.

(2019). "El recurso de *certiorari* es un mecanismo procesal de carácter discrecional que le permite a un tribunal de mayor jerarquía revisar las determinaciones del tribunal recurrido". *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023). Los límites a la facultad revisora del foro apelativo tienen como propósito evitar la dilación que causaría la revisión judicial de controversias que pueden esperar a ser planteadas a través del recurso de apelación. *Scotiabank v. ZAF Corp. et al.*, 202 DPR 478, 486-487 (2019).

No obstante, la discreción del tribunal apelativo en este aspecto no opera en un vacío ni sin parámetros. *Torres González v. Zaragoza Meléndez, supra*; *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 712 (2019). La Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, señala los criterios que se deben tomar en consideración al evaluar si procede expedir un auto de *certiorari*. Estos criterios son:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

El Tribunal Supremo ha expresado que la discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Mun. de Caguas v. JRO Construction, supra*, págs. 712.

### *B. Sentencia Sumaria*

La sentencia sumaria es el mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Soto y otros v. Sky Caterers,* 215 DPR___ (2025), 2025 TSPR 3, pág. 10; Véase, además, *BPPR v. Cable Media,* 215 DPR___ (2025) 2025 TSPR 1. La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que de los documentos que la acompañan, surja de manera preponderante la inexistencia de controversia sobre los hechos medulares del caso. *Soto y otros v. Sky Caterers,* supra.

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. V. M. Cuebas,* 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

> el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de

haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas, supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros*, 213 DPR 80, 91-92 (2023) citando a *Meléndez González et al. v. M. Cuebas, supra.*

En tal sentido, como parte de nuestra función revisora, es nuestro deber evaluar todos los documentos que obren en el expediente de manera tal que, previo a determinar la procedencia de una solicitud de sentencia sumaria, se deba realizar un balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles. *BPPR v. Cable Media,* supra*,* pág. 9 (citas omitidas). Cónsono con lo anterior, en el ejercicio de nuestra función revisora, estamos limitados a: (1) considerar los documentos que se presentaron ante el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 994 (2024).

Por otra parte, nuestra más Alta Curia ha definido el concepto hecho material de la siguiente forma: un hecho material o esencial es "aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Consejo de Consejo Tit. v. Rocca Dev. Corp., et als.,* supra*,* 215 DPR___ (2025) 2025 TSPR 6, pág. 15. Por ende, la parte promovente tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Soto y otros v. Sky Caterers,* supra, pág. 11.

Por su parte, la Regla 36.4 de Procedimiento Civil, *supra,* dispone que si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, no se concede todo el remedio solicitado o se deniega la moción, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos. De la misma forma, el tribunal deberá establecer hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando así que los procedimientos ulteriores sean justos en el pleito. *Íd.* A tono con lo anterior, la precitada regla establece que, al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad. *Íd.*

### C. Responsabilidad Civil Extracontractual

El Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. ant. 5141, establecía que el que por acción u omisión causare un daño a otro, interviniendo culpa o negligencia, estaría obligado a reparar el daño causado.[27] Una acción bajo el Art. 1802 del Código

---

[27] El Código Civil de 1930 fue derogado por la Ley Núm. 55-2020, conocida como el Código Civil de Puerto Rico de 2020, la cual entró en vigor el 28 de noviembre

Civil exigía tres requisitos esenciales: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión, el cual tiene que ser culposo o negligente. *Mena Pamias et al. v. Mélendez et al.*, 212 DPR 758, 768 (2023).

Para que exista responsabilidad como consecuencia de una omisión hay que considerar si: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) si de haberse realizado el acto omitido se hubiera evitado el daño. *Siaca v. Bahia Beach Resort,* 194 DPR 559, 606 (2016).

La defensa de negligencia comparada tiene el efecto de atenuar la responsabilidad de la parte demandada de acuerdo con el grado de negligencia desplegado por la parte demandante que contribuye a la producción de sus propios daños. *Colón Santos v. Coop. Seg. Mult. PR,* 173 DPR 170, 178 (2008). Esta norma tiende a individualizar las indemnizaciones por daño, colocando el rigor económico en las partes conforme a la proporción de su descuido y negligencia. *De León, Hernández v. Hosp. Universitario*, 174 DPR 393 (2008). La doctrina de negligencia comparada requiere que el juzgador, además de determinar el monto de la compensación que corresponde a la víctima, establezca el porcentaje de responsabilidad o negligencia que corresponde a cada parte y reduzca la indemnización del demandante de conformidad con la distribución de responsabilidad efectuada. *SLG Colón-Rivas v. ELA,* 196 DPR 855, 865 (2016), citando a H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, pág. 410. Así, para determinar la negligencia que corresponde a cada parte en casos de negligencia comparada

---

de 2020. Sin embargo, para propósitos de la adjudicación de este recurso, estaremos citando el Código Civil derogado, pues los hechos en controversia surgieron durante su vigencia.

es necesario "analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante". *Íd.*, pág. 865-866.

Ahora bien, el concepto de daño se entiende como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". *Sagardia De Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 505 (2009). En ese sentido, nuestro más Alto Foro ha explicado la división que existe entre los daños patrimoniales y los no patrimoniales. *Íd.* El daño patrimonial es aquel menoscabo valorable en dinero sobre el patrimonio de la persona que ha sido perjudicada. *Íd.*, pág. 506. Por otro lado, el daño no patrimonial es aquel que en principio "no tiene base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria". *Íd.* citando a J. Santos Briz, *Tratado de Derecho Civil,* Barcelona, Ed. Bosch, 2003, T. III, pág. 460.

### III.

En la controversia que nos ocupa, la AEE nos solicita que revoquemos el dictamen emitido y notificado por el foro primario el 7 de octubre de 2024, mediante el cual, se determinó que la muerte del señor Medrano fue a consecuencia de la negligencia de la Peticionaria. Así pues, en su recurso, la AEE alega que el foro *a quo* incidió al no reconsiderar su dictamen y no tomar en consideración que el señor Medrano, su patrono o el dueño del edificio pudieron ser negligentes en esta controversia. Además, la AEE sostiene que el foro primario formuló determinaciones de hechos que no estaban sustentadas por prueba. Finalmente, la Peticionaria señala que el foro primario incidió en denegar una prórroga para presentar oposición a la solicitud de sentencia sumaria, la cual se instó de manera oportuna y fundamentada por parte de la AEE. Por su parte, la señora Peña alega que las

determinaciones de hechos formuladas por el foro *a quo* están respaldadas por evidencia y el dictamen recurrido fue dictado correctamente.

Previo a atender el asunto ante nos, es menester resaltar que, pese a que la AEE identificó el presente recurso como una apelación, este no recurre de sentencia alguna. Si bien, el foro primario intituló el dictamen recurrido como *Sentencia Parcial* el mismo se trata más bien de una resolución interlocutoria. Ello pues, lo que adjudicó en el dictamen recurrido fue la negligencia de una de las partes en un caso de daños y perjuicio. Es decir, el foro primario bifurcó la controversia que tenía ante su consideración. El Tribunal Supremo de Puerto Rico ha aclarado que "el dictamen relativo al aspecto de negligencia, por no ser final, no es apelable; es una resolución que sólo puede ser revisada mediante un recurso de *certiorari*". *García v. Padró*, 165 DPR 324, 334 (2005). Véase, *Abrams Rivera v. E.L.A.,* 178 DPR 914, 928 (2010). Por ello, toda vez que dictamen recurrido es una resolución interlocutoria, el recurso adecuado para su revisión es el *certiorari*. Así pues, a tono con los criterios expuesto en la Regla 40 de nuestro Reglamento, determinamos expedir el presente recurso para así resolverlo en los méritos en aras de evitar un fracaso a la justicia.

Atendido lo anterior, es preciso resaltar que el recurso de epígrafe versa sobre la revisión de un dictamen resuelto por la vía sumaria conforme a la Regla 36 de Procedimiento Civil, *supra.* Siendo ello así, este foro apelativo intermedio se encuentra en la misma posición que el foro primario para evaluar la procedencia de la moción de sentencia sumaria presentada por la señor Peña. Es por ello que, estamos llamados a examinar el expediente *de novo* tanto de la solicitud de sentencia sumaria y sus anejos, así como de su oposición. Efectuado el análisis correspondiente, resolvemos

que la señora Peña cumplió esencialmente con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra*. Por otro lado, en cuanto a la AEE, dicha parte no presentó oposición a la moción de sentencia sumaria, por lo cual no hay nada que evaluar en torno a esta parte.

Resuelto lo anterior, nos corresponde determinar si existen hechos materiales en controversia y, de haberlos, exponer concretamente cuáles son. De igual forma, se esbozarán los hechos que estén incontrovertidos. Véase, *Roldán Flores v. M. Cuebas et al., supra*. Tras realizar un análisis minucioso del expediente del caso, los documentos y las deposiciones anejadas en la solicitud de sentencia sumaria, acogemos como hechos incontrovertidos las determinaciones de hechos formuladas por el foro primario en el dictamen recurrido con excepción de la determinación de hecho número 45 y la determinación de hecho número 47. Por consiguiente, hacemos formar las restantes determinaciones de hechos parte de la presente sentencia. No acogemos la determinación número 45, pues consta en autos que el señor Carlos Perdomo Cheyne no suscribió la comunicación dirigida al ingeniero Yamil Rivera Hernández a la cual se hace referencia en dicha determinación.[28] Tampoco acogemos la determinación de hecho número 47, pues surge del expediente del caso que la

---

[28] Véase, Apéndice del Recurso, págs. 560-561, Deposición tomada a Carlos Perdomo Cheyne el 9 de febrero de 2024, mediante la cual destacamos el siguiente extracto:

P O sea, que esto yo me estoy, esta carta es de 2020
R Veinte, veinte (2020).
P Y alega, según surge de la carta, ser una
contestación a la carta del 1ero de julio de 2020...
R Unjú.
P ... que es el Exhibit ocho (8).
R Unjú. **Esa carta, como vuelvo y le repito, yo nunca escribí esas palabras que están ahí**, porque son palabras bastante técnicas, vamos a decirlo de esa forma y yo simplemente, como le dije, le expliqué a ellos lo que estaba pasando, según ellos me habían dicho que querían que nosotros costeáramos la remoción de las líneas (Énfasis nuestro).

señora Annette Martínez Negrón fue eliminada de la lista de los testigos de la señora Peña.[29]

Ahora bien, al ejercer nuestra función revisora y examinar *de novo* el expediente del caso, **notamos la existencia hechos materiales que están en controversia**. Concretamente, del dictamen apelado no se desprende que el foro primario haya formulado determinaciones de hechos en cuanto a las circunstancias de la servidumbre de la AEE, particularmente sobre por donde transcurrió la línea que causó el fatídico accidente que motiva este pleito. En específico, existe controversia material sobre **sí el edificio en el cual se realizaron las labores de mantenimiento por parte del señor Medrano invadió la servidumbre de la AEE**. De igual forma, es un hecho en controversia **la ubicación exacta de la aludida servidumbre de la AEE**. Asimismo, destacamos que existe controversia sobre si hubo negligencia **por parte del propio señor Medrano, el patrono de este y el dueño del edificio** en el accidente en cuestión.

Ciertamente, el foro primario no dispuso estos elementos en su dictamen, los cuales son esenciales para la adjudicación de negligencia en el caso de autos. Además, es menester subrayar que, si bien no existe impedimento para usar el mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención, "no es aconsejable dictar sentencia sumaria en casos donde existe controversia sobre asuntos de credibilidad o que envuelvan aspectos subjetivos, como la intención, los propósitos mentales o **la negligencia**" (Énfasis nuestro). *Cruz, López v. Casa Bella y otros, supra*, pág. 993. Por tanto, por los fundamentos que anteceden, determinamos que en el caso de marras existen controversias de hechos materiales que

---

[29] Véase, SUMAC, Entrada 157, mediante la cual el foro primario determinó que "Anette Martinez [sic] Negron [sic] fue eliminada como testigo." Asimismo, destacamos que, en su escrito en oposición al recurso de epígrafe, la señora Peña no tuvo reparos en que esta determinación de hecho fuera eliminada.

impiden la resolución de este pleito por la vía sumaria. Tales hechos deberán dilucidarse mediante la celebración de una vista en su fondo, en la que se presente evidencia a esos fines.

**IV.**

Por los fundamentos expuestos anteriormente, **expedimos** el auto de certiorari y **revocamos** el dictamen recurrido. En consecuencia, devolvemos el caso ante el foro primario para la continuación de los procedimientos de conformidad con lo aquí resuelto.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones